# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL ACTION FILE** |
| | **:** | |
| **MARCUS EDWARDS [#2], and** | **:** | **NO. 1:10-CR-132-RWS/AJB** |
| **SHERARD JONES [#3],** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |

## ORDER FOR SERVICE OF
## <u>REPORT AND RECOMMENDATION</u>

Attached is the Report and Recommendation ("R&R") of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and N.D. Ga. CrR. 58.1(A)(3)(a), (b). A copy of the R&R and this order shall be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections to the R&R within **fourteen (14)** days of service of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. *See United States v. Gaddy*, 894 F.2d 1307, 1315 (11th Cir. 1990). The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. If no objections are filed, the

R&R may be adopted as the opinion and order of the District Court and any appellate review of factual findings will be limited to a plain error review.  *United States v. Slay*, 714 F.2d 1093 (11th Cir. 1983).

Pursuant to 18 U.S.C. § 3161(h)(1)(H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act ("the Act"), whether or not objections are actually filed.**  If objections to this R&R are filed, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time all time between the filing of the R&R and the submission of the R&R, along with any objections, responses and replies thereto, to the District Judge.  18 U.S.C. § 3161(h)(1)(D), (H); *Henderson v. United States*, 476 U.S. 321, 331 (1986);  *United States v. Mers*, 701 F.2d 1321, 1337 (11th Cir. 1983).  The Clerk is **DIRECTED** to submit the R&R with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this  13th   day of   October  , 2010.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL ACTION FILE** |
| | : | |
| **MARCUS EDWARDS [#2], and** | : | **NO. 1:10-CR-132-RWS/AJB** |
| **SHERARD JONES [#3],** | : | |
| | : | |
| **Defendants.** | : | |

## UNITED STATES MAGISTRATE JUDGE'S
## NON-FINAL REPORT AND RECOMMENDATION

Before the Court are the motions to suppress evidence filed by Marcus Edwards, [Doc. 67], and Shepard Jones, [Doc. 59]. The Court held an evidentiary hearing on both motions on June 3, 2010, [Doc. 82 (hereinafter "T__")]. The parties filed post-hearing briefs. [Doc. 84 (Edwards); Doc. 85 (Jones); Docs. 90, 91 (Gov't)]. Neither Defendant filed a reply to the government's brief. [*See* Dkt.]. The matters are now ripe for recommended resolutions.

### *Jones*

#### *Facts*

Jones seeks to suppress the fruits of the search of his vehicle, that is, a list of phone numbers. The relevant facts from the evidentiary hearing are as follows. On February 24, 2010, beginning at approximately 5:45 p.m., ATF and other law

enforcement officers were searching 3475 Fairburn Place, Atlanta, Georgia, pursuant to a federal search warrant.  T10-11, 13, 22; *see* search warrant at Doc. 85-2.  After taking part in the search of the residence, ATF Special Agent Aaron Joseph was standing outside of the residence.  T24.  He was wearing his BDU pants and bulletproof vest, and his sidearm was holstered but visible.  T38.  At about 6:15 p.m., Joseph first observed Jones sitting outside the residence on the sidewalk, with his hands handcuffed behind him.  T11, 20.  Joseph did not know the circumstances of Jones' arrest, or whether he had been searched.  T21.  There were other officers in the vicinity mingling around the front yard area, but no one was directly guarding Jones or the other suspects who also were seated in front of the house.  T25.  Each officer was armed but the weapon was holstered.  T38.

The temperature outside was around 40° and falling.  T12; Def. Exh. 2 at 2. Jones told Joseph he was cold, and asked Joseph if he would get his jacket for him. T12, 13, 28.  Joseph stated he would.  T12.  Joseph asked Jones where his jacket was, and Jones responded that it was in his vehicle and indicated towards (by nodding in the direction of) a Ford Taurus parked on the street next to the driveway of the residence being searched.  T12, 14, 28, 29.  Other non-law enforcement cars were parked in the driveway.  T29.  Until Jones so indicated, Joseph had no knowledge that the Taurus was

2

Jones' vehicle or that it otherwise was associated with the residence being searched. T15.

Joseph asked Jones if he could search the vehicle and Jones replied, without hesitation, "yeah." T12, 14, 15, 30. Joseph did not threaten Jones or make any promises to him to get him to consent to the search of the vehicle. T15. He did not tell him he had a right to refuse to consent. T39. Joseph had no suspicions at to what, if anything, would be located in the vehicle. T15. Joseph assumed that the vehicle was locked, so he asked Jones if he had the keys for the vehicle. Jones stated the car should be unlocked. T12, 14, 15. Joseph went over to the vehicle, found it was unlocked, and began searching the entire vehicle. T12, 16, 36. The entire search took 10 to 15 minutes. T36.

On or in the center console, Joseph located a paper containing a list of names and telephone numbers. T16, 31-32. The list was among other papers and items. T32. He also located Jones' coat (although he could not recall where in the car he located it), which he placed on Jones' back after he checked it. T16, 17, 36, 37. Jones thanked him. T17. Joseph did not know whether Jones knew that he had seized the piece of paper, and Joseph did not tell him that he had located it. T36, 37.

3

Joseph did not have a written consent-to-search form with him, since he did not have his own vehicle at the search location, and did not ask any fellow officer for the form.  T17, 39, 40.  Joseph was unaware of Jones' education level[1] or whether he was under the influence of intoxicants.  T41.  Joseph observed no physical distress by Jones.  T41.

*Contentions of the Parties*

Jones contends that the search of his vehicle was unlawful because his consent to search was involuntarily obtained.  [Doc. 85 at 5].  He argues that a reasonable person in his position would not have felt free to decline the agent's request to search because (1) he was under arrest, [*id.* at 6-7]; (2) numerous armed officers had "stormed" the location to be searched, [*id.* at 7]; (3) he was arrested as he tried to escape through a side window, handcuffed, and placed in the sidewalk in front of the residence with others who had been arrested, [*id.* at 7-8]; (4) he remained handcuffed while the agents continued to search the house, [*id.* at 8]; (5) the exchange between Jones and Joseph was coercive because Joseph took advantage of Jones' vulnerable state by implicitly attaching as a condition to granting Jones' request for his jacket the ability to search the vehicle, and since Joseph asked for consent before agreeing to get

---

[1]    Jones was 29 years old and had a high school education.  T42.

4

Jones' jacket, a reasonable person in Jones' position would not have felt free to deny consent or interrupt the search once it began, [*id.* at 8-10]; and (6) Joseph failed to advise Jones of his right to deny consent. [*Id.* at 10-11].

Jones next argues that the search and seizure of the paper from the console of the Taurus was unlawful because, assuming lawful consent was obtained, it was unreasonable to assume his consent extended to his private papers. [Doc. 85 at 11-12]. He submits that to extend any consent to search the vehicle to private papers would unconstitutionally expand the search to a general exploratory rummaging through a person's belongings. [*Id.* at 12]. In support, he cites to cases where a consent to search for narcotics was found not to extend to a search for papers. [*Id.* at 13-14 (citing *United States v. Dichiarinte*, 445 F.2d 126 (7th Cir. 1972), and *United States v. Sell*, No. 04-CR-0099, 2005 WL 6236467 (N.D. Ill. Oct. 31, 2005)]. Therefore, he contends, a reasonable person would not have understood the exchange between Jones and Joseph to authorize a general exploratory search that included personal papers. Instead, he argues, the totality of the circumstances - the search of the residence, the search warrant for narcotics, and Jones' arrest - limited the consent to a search of the Taurus to narcotics. [*Id.* at 14]. He then argues that even if Joseph was authorized to search the papers for narcotics, reading their contents was unnecessary and unreasonable. [*Id.*].

AO 72A
(Rev.8/8
2)

He further argues that he neither signed a consent form nor expressly agreed that the search could encompass his private papers. [*Id.*]. Jones argues that his case is distinguishable from *United States v. De La Rosa*, 922 F.2d 675 (11th Cir.1991), where following a defendant's consent to the search of his car, the seizure and search of a notebook in the back seat were found to be within the scope of the consent. [Doc. 85 at 15-16]. Jones argues that the *De La Rosa* Court's failure to discuss the circumstances of the stop, including any facts known to the defendant which would have limited the search of the vehicle to narcotics and excluded private papers, as well as the defendant's apparent failure to argue that his consent was limited, distinguishes that case from his, where the drug raid and drug arrests preceded his arrest and consent. [*Id.* at 16-17].

Finally, Jones argues that even if he properly consented to a search of the vehicle including his papers, the seizure of the papers was unlawful because it was without probable cause, because at the time of the seizure, Joseph did not know of Jones' involvement in the drug crimes at the residence, his connection to the residence or the circumstances of his arrest. [*Id.* at 17-19].

The government responds that Jones voluntarily consented to the search of his vehicle. It argues that although he was under arrest, the arrest was based on probable

6

cause.[2]  [Doc. 91 at 7].  It further argues that even though the officers initially drew their weapons, at the time Joseph sought Jones' consent, his weapon was holstered.  [*Id.* at 8].  It notes that Jones initiated the conversation with Joseph after the initial excitement from the raid subsided.  [*Id.*].  It also argues that there was no other coercive police conduct.  [*Id.* at 8].  Since Jones voluntarily consented to a search of his vehicle and placed no restrictions on the consent, the search of the vehicle and seizure of the paper with the phone numbers was lawful.  [*Id.* at 9].  The government also challenges Jones' arguments that the seizure of the document was not supported by probable cause or that its relationship to the crimes being investigated was not immediately apparent, arguing that the list of phone numbers clearly was relevant to the ongoing drug investigation.  [*Id.* at 10].

---

[2]      The government requests that the Court take judicial notice of the complaint (Doc. 1) filed in this case.  [Doc. 91 at 7 n.1].  Pursuant to FED. R. EVID. 201, the Court may take judicial notice of the contents of the criminal complaint filed in this case.  *Urbanique Production v. City of Montgomery*, 428 F. Supp. 2d 1193, 1201 n.5 (M.D. Ala. 2006) (taking judicial notice of criminal complaint in related case for purposes of ascertaining the sequence of events which occurred) (citing FED. R. EVID. 201; *Griffin v. United States*, 109 F.3d 1217, 1218 n.1 (7th Cir. 1997)).  The complaint in this case reflects that upon entering the residence pursuant to the search warrant, agents found cocaine, scales, firearms, ammunition and plastic bags on the kitchen table, more cocaine in and around the bathroom toilet and Jones trying to escape outside of a side window.  He had over $900 in his pocket.  These facts establish probable cause for Jones' arrest.

7

*Discussion*

1.   <u>Consent</u>

A search conducted pursuant to consent is "one of the specifically established exceptions to the requirements of both a warrant and probable cause[.]" *United States v. Santa*, 236 F.3d 662, 676 (11th Cir. 2000) (quoting *United States v. Freyre-Lazaro*, 3 F.3d 1496, 1500-01 (11th Cir. 1993), and *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).[3] "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). In considering whether a consent to search was voluntary, the Court must examine the totality of the circumstances. *United States v. Tovar-Rico,* 61 F.3d 1529, 1535 (11th Cir. 1995); *see also United States v. Gonzalez,* 71 F.3d 819, 828-32 (11th Cir. 1996) (illustrating factors properly to be considered in totality of circumstances inquiry). The absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that "[w]here there is coercion, there cannot be consent." *Gonzalez*, 71 F.3d at 828 (quoting *Bumper v. North Carolina,* 391 U.S. 543,

---

[3]        Further, "'[t]he government bears the burden of proving . . . that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily.' " *United States v. Hidalgo*, 7 F.3d 1566, 1571 (11th Cir. 1993) (quoting *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989)).

8

550 (1968)); *see also Florida v. Bostick,* 501 U.S. 429, 438  (1991) ( " 'Consent' that is the product of official intimidation . . .  is not consent at all.").

The Eleventh Circuit has identified a non-exhaustive list of relevant factors to consider when making the assessment of whether consent to a warrantless search is voluntary: voluntariness of the defendant's custodial status, the presence of coercive police procedures, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.  *Blake*, 888 F.2d at 798-99.  None of these factors individually is dispositive.  *United States v. Holmes*, 270 Fed. Appx. 767, 768 (11th Cir. 2008) (citing *United States v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir. 1984), *reinstated on reh'g*, 764 F.2d 747 (11th Cir. 1985) (*en banc*)).

Considering the totality of the circumstances, the Court concludes that Jones voluntarily consented to the search of the Taurus.  First, although Jones was under arrest or detained, and sensitivity to the heightened possibility of coercion is appropriate when a defendant's consent is obtained during custody, *see Schneckloth*, 412 U.S. at 240 n.29, " 'custody alone has never been enough in itself to demonstrate . . . coerced . . . consent to search.' " *United States v. Barnett*, 989 F.2d

9

546, 555 (1ˢᵗ Cir. 1993) (quoting *United States v. Watson*, 423 U.S. 411, 424(1976));

*see also Bostick*, 501 U.S. at 435-36 (explaining that consent can be voluntary even

though the detainee does not feel free to leave).  Moreover, although the search of the

house commenced with the arrival of several armed police officers, by the time Joseph

asked Jones for consent, law enforcement officers' firearms, including Joseph's, were

holstered and any law enforcement officers in Jones' presence were not engaging in any

coercive conduct towards him.  *See United States v. Broome*, No. 1:05-CR-135-WSD,

2006 WL 508054, *6 (N.D. Ga. Feb. 28, 2006) (finding voluntary consent despite

defendant's custodial status where "agents' conduct toward Defendant, both before and

after his arrest, was not coercive, threatening or intimidating"); *see also United States*

*v. Telly*, 362 Fed. Appx. 83, 86-87 (11ᵗʰ Cir. 2010) (finding voluntary consent where

defendant was in handcuffs and in custody because officers did not employ any

coercive tactics, brandish their weapons, or threaten, lie or otherwise pressure defendant

into acceding to their request for consent to search).  As to this factor, it is also

significant that Jones's custodial status was supported at a minimum by reasonable

suspicion, if not probable cause.

Second, Joseph employed no coercive procedures to get Jones to consent.

Although Jones argues that Joseph implicitly conditioned retrieving Jones' coat upon

10

his consent to search the Taurus, the evidence demonstrates that Joseph already agreed to get Jones' coat before he asked Jones for consent. T12. The fact that Jones thanked Joseph for the coat is an indication that he did not believe that he was subjected to a coercive *quid pro quo*.

Third, while there is scant evidence in the record about the extent and level of the defendant's cooperation with police, two facts point towards a finding that Jones' consent was voluntary. These facts are that Jones was comfortable enough to tell Joseph that he was cold and ask him to retrieve his jacket for him; and he nodded with his head towards the Taurus when Joseph asked him which vehicle was his. These facts demonstrate that Jones was not intimidated by Joseph's presence.

One court has described this factor as including consideration of the length of detention and the nature of the questioning, including the use of coercive police behavior. *United States v. Nuyens*, 17 F. Supp. 2d 1303, 1306 (M.D. Fla. 1998). In this case, it appears that Jones was in custody or detained approximately 30 minutes, which is not so long a period to render Jones consent involuntary. *Cf. United States v. Costa*, 363 F.3d 1141, 1148 (11th Cir. 2004) (holding that detention of 30 minutes did not transform investigative stop into *de facto* arrest unsupported by probable cause, such that consent would be rendered involuntary). Also, there is no evidence that Jones was

subjected to custodial interrogation during this period or that, other than whatever force was applied to arrest him, that he was in anyway mistreated. *See Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002) (recognizing that the typical arrest involves some force and injury).

Fourth, while Joseph did not advise Jones of his right to refuse to consent to the search, "the government need not establish [defendant's] knowledge of the right to refuse consent as the sine qua non of effective consent." *United States v. Zapata*, 180 F.3d 1237, 1241 (11th Cir. 1999) (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). Similarly, the lack of a consent to search form does not automatically render consent involuntary. *See United States v. Smith*, 199 Fed. Appx. 759, 761, 763 (11th Cir. 2006) (finding oral consent voluntary where defendant did not sign consent to search form); *United States v. Boukater*, 409 F.2d 537, 538 (5th Cir. 1969) (oral consent voluntary even where defendant initially refused to sign written waiver, as he reiterated consent after refusing to put anything in writing)[4]; *United States v. Weeks*, 666 F. Supp. 2d 1354, 1377 n.33 (N.D. Ga. 2009) (Thrash, J.) ("[T]he agents' failure to have [the defendant's girlfriend] sign a consent to search form does not support the

---

[4]       In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

12

contention that [she] did not voluntarily consent to the search because [she] orally consented and understood what was being asked of her."); *see also United States v. Lopez-Mendoza*, 601 F3d 861, 866 n.2 (8th Cir. 2010) (holding that "a written consent form . . . [is] not necessary . . . to establish that a person voluntarily consented to a search") (citation omitted).

Fifth, the evidence demonstrates that Jones was a high school graduate and was 29 years of age.  Consequently, there is no evidence that Joseph overbore Jones' will to resist the request to consent due to his lack of education or youth.

Sixth, the evidence supports a conclusion that Jones believed that no incriminating evidence would be found in the vehicle, since the vehicle contained no drugs, weapons or large sums of currency.

Therefore, the Court finds that Jones voluntarily consented to let Joseph search his vehicle.

2.   <u>Scope of consent</u>

Jones next claims that even if he voluntarily consented to a search of his vehicle, that consent did not extend to permitting a search of any papers in his vehicle, including the one which contained names and telephone numbers.  A search is impermissible when an officer does not conform to the limitations imposed by the person giving

AO 72A
(Rev.8/8
2)

consent.  *Zapata*, 180 F.3d at 1242; *United States v. Strickland*, 902 F.2d 937, 941 (11th Cir. 1990) ("A consensual search is confined to the terms of its authorization") (citations omitted); *see also United States v. Martinez*, 949 F.2d 1117, 1119 (11th Cir. 1992) (holding that consensual search is confined to the terms of actual consent given). When an individual provides a general consent to search, without expressly limiting the terms of his consent, the search "is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass." *Strickland*, 902 F.2d at 941; *see also Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent . . . is that of 'objective' reasonableness - - what would the typical reasonable person have understood by the exchange between the officer and the suspect?").  To ascertain what conduct is within the "bounds of reasonableness," the Court must consider what the parties knew to be the object (or objects) of the search.  *See Jimeno*, 500 U.S. at 251; *Martinez*, 949 F.2d at 1119. However, a general consent to search for specific items includes consent to search any compartment or container that might reasonably contain those items.  *Martinez*, 949 F.2d at 1120.  In justifying a consensual search, the government bears the burden of establishing that the search was conducted within the purview of the consent received. *Blake*, 888 F.2d at 800.

14

At the same time, a defendant's lack of knowledge of what the officer is searching for does not change the effect of a "general consent." *United States v. Snow*, 44 F.3d 133, 135 (2d Cir. 1995) (interpreting *Jimeno*). The *Snow* Court concluded that it is self-evident that a police officer seeking general permission to search is looking for evidence of illegal activity. *Id.* It further noted that if the consent to search is entirely open-ended, a reasonable person would have no cause to believe that the search will be limited in some way.

In this case, Jones' consent to allow his vehicle to be searched was a general consent, not limited in any way. The cases relied upon by him are inapposite to the present case. In *Dichiarinte*, the agents advised the defendant that their search was for narcotics. In addition to searching for narcotics, they searched through his personal papers over his objections. *Dichiarinte*, 445 F.2d at 128-29. Under those facts, the Seventh Circuit found the search beyond the scope of the defendant's consent. No such restriction was imposed or voiced in the present case, and thus *Dichiarinte* is not illustrative of the result to be reached in this case.

Similarly, in *Sell*, the police advised the defendant that they were searching for narcotics and he consented to a search on that basis, but the officers searched his

15

computer for evidence of child pornography.  *Sell*, 2005 WL 6236467 at *3-4.  Again, no such limitation or restriction is supported by the record in this case.

Contrary to Jones' arguments, *De La Rosa* is controlling in this case.  In *De La Rosa*, in the course of a narcotics investigation, the defendant was stopped and was asked and gave permission for the officer to search his car.  In searching the vehicle, the officer located a notebook in the back seat and after reading its contents, concluded it related to narcotics transactions.  In finding the notebook within the purview of his consent the Eleventh Circuit held:

> Appellant also argues that . . . his consent did not extend to the contents of the notebook found in the back seat.  A consensual search is confined to the terms of its authorization.  *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989).  At bar, we find that appellant voluntarily consented to a search of the interior of his automobile and placed no special restrictions on that search.  Thus, it was reasonable for Detective Gross to open the notebook which he found lying on the seat.  *Compare United States v. Milian-Rodriguez*, 759 F.2d 1558, 1563 (11th Cir. [1985]) (upholding search of locked closet after defendant gave voluntary consent to search his house) [ ].

*De La Rosa*, 922 F.2d at 679.  As in *De La Rosa*, Jones' consent was not limited, and the seizure of the document containing a list of names and phone numbers was lawful.

16

### 3.    Probable cause/plain view

Finally, Jones argues that the seizure of the paper with the names and telephone numbers was invalid because it was not supported by probable cause.  An officer conducting a lawful search, such as Joseph in this case, may seize items discovered in plain view if probable cause exists to believe the items are evidence of criminal activity. *See Texas v. Brown*, 460 U.S. 730, 741-42 (1983) (reconsidering the "immediately apparent" language in *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), and substituting a less rigorous probable cause standard for plain view seizures).  Probable cause to seize an item in plain view exists  whenever the facts available to the searching officer support a reasonable belief that the item may be contraband, stolen property, or evidence of a crime.  *Id.* at 742.  The plain view doctrine, however, cannot be used to justify exploratory or investigative searches until "something incriminating at last emerges." *Coolidge*, 403 U.S. at 446.

Although Jones argued at the evidentiary hearing that he was entitled to inquire into Joseph's subjective mind set in seizing the document, the Court then and now disagrees that Joseph's subjective reasons for seizing the document were relevant. Probable cause issues are to be decided on an objective basis by courts without regard to the subjective beliefs of law enforcement officers, whatever those beliefs may have

17

been.  *See, e.g., Whren v. United States,* 517 U.S. 806, 813-14 (1996) ("Subjective intentions play no role in ordinary, probable-cause, Fourth Amendment analysis."); *Ornelas v. United States,* 517 U.S. 690, 696 (1996) (probable cause is based upon evaluation of the "facts, viewed from the standpoint of an objectively reasonable police officer"); *United States v. Roy,* 869 F.2d 1427, 1433 (11th Cir. 1989) (rejecting notion that probable cause turns on what law enforcement officers think and holding that "[c]ourts determine the existence of probable cause"); *see also Horton v. California,* 496 U.S. 128, 138 (1990) ("[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.").

   In fact, the courts specifically have considered the propriety of seizures under the plain view doctrine on an objective basis.  *See Horton,* 496 U.S. at 138 (where the Court rejected argument that "plain view" seizure requires inadvertent discovery, in part because of its preference for "application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer"); *cf. Scott v. United States,* 436 U.S. 128, 138 (1978) (stating that "fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal

18

justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action").

Although the Court's research has not uncovered any Eleventh Circuit discussion of whether the plain view doctrine is to be considered on an objective basis, other courts have squarely held that whether an item is properly seized under the plain view doctrine is viewed objectively. *See United States v. Stafford*, 416 F.3d 1068, 1076 (9th Cir. 2005) ("The determination of whether the officers had probable cause to believe that the items seized were illegal, unlawful, or associated with criminal activity is objective, but we apply it to the 'actual and/or perceived belief of the law enforcement officer as he . . . engages in search and seizure.' . . . This standard does not require the officers to know that the item seized is illegal.") (citations omitted); *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 554 (6th Cir. 2003) ("Assuming that the officers were executing a valid warrant and thus were legally in a place where they saw the jewelry and documents in plain view, the seizure of these items during the execution of the first warrant was nevertheless unconstitutional because their incriminating character is not immediately apparent as an objective matter."); *United States v. Reed*, 726 F.2d 339, 343 (7th Cir. 1984) ("Executing officers, however, need not know that items in plain view were stolen before they may act on the items' immediately apparent

19

incriminating nature; a reasonable belief, using the probable cause formulation, is sufficient in the ordinary case.") (citing, *inter alia*, *Texas v. Brown*, 460 U.S. 730 (1983)); *United States v. Messino*, 871 F. Supp. 1035, 1039 (N.D. Ill.1995) ("The court finds no controlling precedent as to the objectivity of the immediate apparency requirement itself, but controlling cases discussing the objectivity of the Fourth Amendment reasonableness inquiry in general are read naturally to apply to this particular aspect of Fourth Amendment jurisprudence.").

Viewed objectively, Joseph had probable cause to seize the document containing names and telephone numbers under the plain view doctrine. The investigation that led to the issuance and execution of the search warrant disclosed that several individuals were selling crack cocaine from the residence to be searched. [Doc. 85-2 at 2, ¶¶ 5-13]. The affidavit in support of the warrant further stated that

> narcotic traffickers require the cooperation and association of a number of people within a narcotics distribution organization. As a result, narcotics traffickers will possess documents that identify other members of the organization, such as telephone books, address books, telephone bills, and other documents carrying a number of names.

[*Id.* at 4, ¶ 17]. Jones was apprehended trying to escape from the residence as it was being searched. He had over $900 on his person. Cocaine and items commonly used in the distribution of cocaine, including firearms, were located inside of the

20

residence.  [Doc. 1].[5]  Personal telephone directories, containing names and telephone numbers, have been held admissible in narcotics trials as "tools of the trade."  *United States v. Nava-Salazar*, 30 F.3d 788, 798 (7th Cir. 1994).  In considering whether probable cause exists, the observations and experiences of the law enforcement officers working a case must be weighed as a part of the totality of the circumstances that might create probable cause.  *United States v. Gonzalez*, 969 F.2d 999, 1003 (11th Cir. 1992) (probable cause for arrest).

The Court concludes that probable cause supported the seizure of the paper with the names and telephone numbers from Jones' automobile.  Joseph was properly inside the vehicle, having received a voluntary consent from Jones to search the vehicle and the consent was given without any limitations or restrictions.  The execution of the search warrant at the residence resulted in the discovery of cocaine, currency, firearms and items commonly used to distribute cocaine.  A reasonable experienced officer would have objectively recognized the potential evidentiary value of a list of names and

---

[5]      The Court recognizes that Joseph testified that he was unaware of the time of the circumstances of Jones' arrest or what was seized personally from him. T21. However, "[w]hen a group of officers is conducting an operation and there exists at least minimal communication between them, their collective knowledge is determinative of probable cause."  *United States v. Wilson*, 894 F.2d 1245, 1254 (11th Cir. 1990).  Joseph had been assisting the group of officers in executing the search warrant. T23.

21

telephone numbers under these circumstances.  As a result, the document was properly seized.

For these reasons, the undersigned **RECOMMENDS** that Jones' motion to suppress, [Doc. 59], be **DENIED**.

### *Edwards*

#### *Facts*

On April 15, 2010, during daytime hours, ATF Special Agent Eric Degree came to the Fulton County Jail to take Edwards to federal court following the return of the instant indictment and issuance of a federal arrest warrant.  Agent Degree retrieved Edwards  from the processing area at the Fulton County Jail, where Edwards had been held on state charges.  T45-46, 47.  The area where he encountered  Edwards was the area in the jail where prisoners either were released or turned over to other jurisdictions. T47.  Edwards was being released on the state charges and arrested on the federal charges.  T48.  The state charges were unrelated to the federal charges.  T70-71.

Degree advised Edwards that he was going to search him. T53, 54.  He searched Edwards, by moving him to a location where he could be searched, removing items from his hands and telling him to empty his pockets. T48.  Degree testified that he was going to frisk and do a thorough search of Edwards' person, so the request for Edwards

22

to remove anything from his pockets merely facilitated those actions.  T49.  He further testified that he conducts searches of prisoners whom he picks up from local jurisdictions for officer safety, but also for the U.S. Marshal, into whose custody the prisoner will go, because there are items which the Marshal will not take.  T49.  Degree testified that it was his understanding that the Marshal disallowed any jewelry or paperwork other than legal paperwork.  T51.  Degree later would turn those items over to a relative or back to the defendant.  T49.

Degree recovered from Edwards an anklet, various documents including one with phone numbers, and a lawyer's business card.  T49.  The document with phone numbers either was in Edwards' hands or in his pocket.  T50; Def. Edwards Exh. 1. Degree did not consider the document with phone numbers to be legal paperwork but rather to be of possible evidentiary value, so he kept that document, took it back to his office and copied it.  T50, 51, 66.  He also testified that he seized it because the Marshal would not allow Edwards to have it in federal custody.  T66.  Other items were returned, with Edwards' permission, to Edwards' mother, for which he completed an inventory.  T50-51, 69.  No items seized were returned to Edwards directly.  T51.

23

*Contentions of the Parties*

The gist of the issue is whether Edwards was arrested by Degree or Degree was simply transporting him to the federal building.  If Degree was effecting a new custodial arrest of Edwards, a full blown search incident to that arrest was appropriate. If Degree merely was a transport officer, then the scope of an allowable search is much narrower.

Edwards argues that he already had been arrested, processed and incarcerated in the Fulton County Jail before Degree came to pick him up.  He argues that since the Fulton County Jail prohibits firearms or contraband, it was unlikely that Degree needed to search him for those items, and at most, he should have merely patted him down.  [Doc. 84 at 7].  In this regard, he argues that while a limited *Terry* pat down would have been justified, the seizure of his documents was not reasonably related to any circumstance which initially justified the initial encounter between Degree and Edwards.  [*Id.* at 8].  He further argues that if the Marshal did not allow Edwards to possess certain non-legal papers, then Degree could have turned them over to Edwards' mother like he did with the balance of Edwards' property.  [*Id.*].

Edwards also contends that the facts of this case are vastly different from a street arrest, which pursuant to *United States v. Robinson*, 414 U.S. 218 (1973), permits a full

24

search of the arrestee. [Doc. 84 at 8-9]. He further argues that the seizure of the documents interfered with his possessory rights under the Fourth Amendment. Like Jones argued in support of his motion to suppress, Edwards argues that Degree lacked probable cause to believe that the documents were related to criminal activity. [*Id.* at 9-11]. Also, Edwards argues that the Court improperly prohibited him from asking Degree what was the basis for his belief that the document had evidentiary value. [*Id.* at 11]. In any event, he argues, Degree lacked probable cause to believe the documents were evidence of a crime that subjected them to seizure. [*Id.* at 11-12].

The government responds, first, that Degree could conduct a full search of Edwards as incident to a lawful arrest. [Doc. 90 at 2-3]. It acknowledges that the circumstances of this case are different from a street arrest, but argues that Edwards had a lesser expectation of privacy as a prisoner, citing *Hudson v. Palmer*, 468 U.S. 517 (1984), and its progeny. [Doc. 90 at 3]. As a result, it argues, the search in this case did not violate the Fourth Amendment because Edwards did not prove that he had a "justifiable" expectation of privacy. [*Id.* at 4-5]. The government also argues that *Terry* and the plain view doctrine are not relevant to the factual scenario in this case. [*Id.* at 6].

25

*Discussion*

The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures.  U.S. CONST. AMEND. IV.  "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586 (1980); *United States v. Santa*, 236 F.3d 662, 668 (11th Cir. 2000).  Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution.  *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (citing *United States v. Impson,* 482 F.2d 197 (5th Cir. 1973)).   Thus, the government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the Fourth Amendment.  *Vale v. Louisiana*, 399 U.S. 30, 34 (1969); *United States v. Jeffers*, 342 U.S. 48, 51 (1951); *Freire*, *supra*.

Initially, the Court rejects the government's argument based on *Parker v. Hudson*.  That case involved the random search of a prison cell of a convicted inmate, 468 U.S. at 519-20.  The Supreme Court has left unresolved whether and to what extent the Fourth Amendment protections extend to pretrial detainees.  *Wright v. Whiddon*,

26

951 F.2d 297, 300 (11th Cir. 1992); *United States v. Cobb*, 905 F.2d 784, 788 n.7 (4th Cir. 1990).  In any event, Degree was not conducting a search of Edwards' cell in the Fulton County Jail, and it appears that at the time Degree searched Edwards, the reason for his being in state custody - state charges - had evaporated.  From the record before the Court, Edwards would have been released on state charges - whether as a result of dismissal or posting bond - to the street if Degree had not arrived at the Fulton County Jail to place Edwards into federal custody.

The question remains, was this a new arrest or merely a transport of a prisoner. Although the government's brief does not help the Court much, Defendant has not pointed the Court to any controlling authority either way, and the Court has found none. Nonetheless, the Court concludes that Degree was acting as an arresting officer and not merely as a transport officer.  Edwards was no longer being held on any state charges. The instant federal indictment had been returned and a valid arrest warrant, unchallenged by Defendant, issued.  As an ATF special agent, Degree was authorized to execute the arrest warrant by arresting Edwards. *See* 18 U.S.C. § 3051(a) (describing duties of ATF special agents, including power to serve warrants and make arrests); FED. R. CRIM. P. 4(c)(3)(A) ("A warrant is executed by arresting the defendant.").  "It is well settled that a search incident to a lawful arrest is a traditional

27

exception to the warrant requirement of the Fourth Amendment." *Robinson*, 414 U.S. at 224.

As a result, Degree could search Edwards pursuant to the lawful arrest. As the Supreme Court noted in *Robinson*:

> A police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick ad hoc judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search. The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment.

*Robinson*, 414 U.S. at 235. Both the Supreme Court and the lower federal courts have repeatedly recognized the right of the police to open and inspect papers, wallets, address books, and similar items seized from an arrestee in order to determine whether they have evidentiary value. *Robinson*, 414 U.S. at 223-24, 236 (officer was entitled to inspect crumpled cigarette package found on arrestee's person, and thus heroin capsules found in the package were admissible); *United States v. Richardson*, 764 F.2d

28

1514, 1527 (11th Cir. 1985) (officers were entitled to search wallet and papers found on defendants' persons incident to their arrest); *United States v. McFarland*, 633 F.2d 427, 429 (5th Cir. 1980) (officer was entitled to read a piece of notebook paper removed from defendant's shirt pocket incident to his arrest); *United States v. Castro*, 596 F.2d 674, 677 (5th Cir. 1979) (unfolding and reading of paper found in defendant's wallet was valid search incident to his arrest); *United States v. Rodriguez*, 995 F.2d 776, 778 (7th Cir. 1993) (photocopying contents of address book was a valid search incident to arrest); *United States v. Ortiz*, 84 F.3d 977, 984 (7th Cir. 1996) (recognizing that "law enforcement officers have the authority to immediately 'search' or retrieve, incident to a valid arrest, information from a pager in order to prevent its destruction as evidence"). "As one commentator has noted, in applying *Robinson*, the lower courts 'have deemed evidentiary searches of an arrested person to be virtually unlimited.' " *United States v. McCray*, No. CR408-231, 2009 WL 29607, *2 (S.D. Ga. Jan. 5, 2009) (quoting 3 Wayne R. LaFave, *Search and Seizure* § 5.2(c), at 110 (4th ed. 2004)).

As for Edwards' argument that notwithstanding the propriety of the arrest, Degree still needed to have an evidentiary purpose for seizing the telephone list, binding case law in this Circuit governs Degree's actions and compels the Court to reject Edwards' arguments. As the court held in *McFarland*:

29

McFarland next claims that the seizure of the piece of notebook paper from his shirt pocket was the product of an impermissibly broad search incident to arrest since the arresting officer was not aware of the existence or the incriminating nature of the piece of paper until he seized it from McFarland and read it. This contention is frivolous. The purpose of the doctrine permitting searches incident to arrest is to allow discovery and preservation of destructible evidence like this piece of paper. *Chimel v. California*, 359 U.S. 752, 762-63[ ] (1969).  Moreover, the validity of the search does not depend on any probability that such evidence will be found; a full search incident to arrest is reasonable and permissible under the Fourth Amendment.  [ ] *Robinson*, 414 U.S. [at] 235[ ].

*McFarland*, 633 F.2d at 429; *see also United States v. Holzman*,  871 F.2d 1496, 1505 (9th Cir. 1989) ("For an item to be validly seized during a search incident to an arrest, the police need not have probable cause to seize the item, nor do they need to recognize immediately the item's evidentiary nature.  *Robinson*, 414 U.S. at 235[ ]."), *abrogated on other grounds by Horton*, 496 U.S. at 153.  Therefore, Degree needed no evidentiary basis for seizing Edwards' papers when he arrested him on the federal indictment pursuant to a federal arrest warrant.  As a result, Edwards' motion to suppress, [Doc. 67] should be **DENIED**.

*Conclusion*

For all of the above and forgoing reasons, the undersigned **RECOMMENDS**

that Jones and Edwards' motion to suppress, [Docs. 59, 67], be **DENIED**.

**IT IS SO RECOMMENDED**, this the ___13th___ day of October, 2010.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

31